

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE  OCT 3 1 2019

CHIEF JUSTICE

This opinion was
filed for record
at 8a.m. on Oct. 31, 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL
925, a labor organization,

Petitioner,

v.

STATE OF WASHINGTON,
DEPARTMENT OF EARLY
LEARNING, a state agency, and
EVERGREEN FREEDOM
FOUNDATION, a nonprofit corporation,

Respondents.

NO. 96578-1

EN BANC

Filed    OCT 3 1 2019

STEPHENS, J.—Respondent Evergreen Freedom Foundation (Foundation)

filed a Public Records Act (PRA), chapter 42.56 RCW, request for the names and

addresses of individuals who provide subsidized childcare under Washington's

Working Connections Child Care program (WCCC). After the Foundation filed its

request but before any records were released, voters passed an initiative exempting

those names and addresses from PRA coverage and prohibiting agencies from

releasing them. The question presented in this case is whether that initiative bars release even though it did not take effect until after the Foundation made its public records request. We hold that the answer is yes.

## FACTS

The Department of Early Learning (Department) administers the WCCC, which subsidizes childcare for low income families. The subsidies fund childcare in both commercial and private residential settings, but this case involves only the latter. Providers in private residential settings are called "family child care providers" and may be either licensed or license exempt. Clerk's Papers (CP) at 904. State law defines family childcare providers as public employees for the purposes of collective bargaining, RCW 41.56.028(1), (3), and petitioner Service Employees International Union Local 925 (SEIU 925) represents these workers.

On November 2, 2016, the Foundation submitted a PRA request to the Department seeking the following:

1. The first name, last name, work mailing address, and work email address of all licensed family child care providers, as defined by RCW 41.56.030(7).
2. The first name, last name, work mailing address, and work email address of all license-exempt family child care providers, as defined by RCW 41.56.030(7).

CP at 909.

The Department informed SEIU 925 that, in the absence of a court injunction, it would release all the requested information to the Foundation on November 22, 2016. On November 8, 2016, Washington voters approved Initiative 1501 (I-1501), which "prohibit[s] the release of certain public records that could facilitate identity theft and other financial crimes against seniors and vulnerable individuals." *Id.* at 299. Two of the initiative's provisions address the release of records responsive to the Foundation's PRA request. One provision, now codified at RCW 43.17.410(1), provides that "neither the state nor any of its agencies shall release sensitive personal information of vulnerable individuals or sensitive personal information of in-home caregivers for vulnerable populations, as those terms are defined in RCW 42.56.640." The other, now codified at RCW 42.56.640(1) in the PRA, provides that "[s]ensitive personal information of vulnerable individuals and sensitive personal information of in-home caregivers for vulnerable populations is exempt from inspection and copying under this chapter." The new law defines "'[i]n-home caregivers for vulnerable populations'" to include WCCC "family child care providers." RCW 42.56.640(2)(a). It defines "'[s]ensitive personal information'" as "names, addresses, GPS [global positioning system] coordinates, telephone numbers, email addresses, social security numbers, driver's license numbers, or other personally identifying information." RCW 42.56.640(2)(b) (second alteration

in original). The initiative took effect on December 8, 2016. LAWS OF 2017, ch. 4 (I-1501).

*Procedural History*

Three weeks before the new law took effect, SEIU 925 filed a complaint for declaratory and injunctive relief barring the Department from releasing the records. It sought a temporary restraining order and a preliminary injunction. The parties agreed to extend any deadline for release until after the court could rule on the motion for a preliminary injunction. The trial court issued its ruling December 9, 2016, one day after I-1501 took effect. It denied injunctive relief but ordered the Department to delay release so SEIU 925 could appeal the ruling. Division Two granted the Department's motion for an emergency injunction, pending the appellate court's final decision. That court affirmed on September 18, 2018. *Serv. Emps. Int'l Union Local 925 v. Dep't of Early Learning*, No. 49726-3-II (Wash. Ct. App. Sept. 18, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/ D2%2049726-3-II%20Unpublished%20Opinion.pdf.

In the Court of Appeals, SEIU 925 argued that the trial court erred by failing to apply I-1501 (specifically, the provisions later codified at RCW 43.17.410(1) and RCW 42.56.640) because that law barred release of the requested records by the time the court ruled on the motion for a preliminary injunction. *Id.* at 8. Division Two

-4-

rejected that argument, holding that the preliminary injunction was governed by the law in effect at the time of the Foundation's *request* and that I-1501 did not meet any of the criteria necessary to establish retroactive application. *Id.* at 10-15. It reasoned that, absent retroactivity, the law governing a disputed public records request is always "the law in existence at the time the request was made." *Id.* at 13 (citing *John Doe A v. Wash. State Patrol*, 185 Wn.2d 363, 375 n.2, 374 P.3d 63 (2016)). Citing only *Dragonslayer, Inc. v. Washington State Gambling Commission*, 139 Wn. App. 433, 449, 161 P.3d 428 (2007), the court also concluded that a PRA request creates a "vested right" that cannot be retroactively infringed. *SEIU 925*, No. 49726-3-II, slip op. at 12. Because it concluded that no PRA exemption applied, the court did not consider whether SEIU 925 met the other requirements for injunctive relief. *See Ameriquest Mortg. Co. v. Office of Att'y Gen.*, 177 Wn.2d 467, 487, 300 P.3d 799 (2013) (nonagency party seeking injunction to prevent PRA disclosure must show (1) record specifically pertains to that party, (2) an exemption applies, and (3) disclosure is not in the public interest and would substantially and irreparably harm that party or a vital government interest).

About six weeks after the Court of Appeals issued its decision in this case, another Division Two panel reached the opposite conclusion in a case with identical relevant facts. The court in *Puget Sound Advocates for Retirement Action v.*

*Department of Social & Health Services* (*PSARA*) held that, even if I-1501 did not apply retroactively, it still barred the release of records responsive to requests already pending upon its enactment. No. 50430-8-II, slip op. at 7 (Wash. Ct. App. Oct. 30, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/ D2%2050430-8-II%20Unpublished%20Opinion.pdf. The *PSARA* court reasoned that the plain language of RCW 43.17.410(1) did not just *exempt* care providers' personal information from the PRA but also, separately, prohibited the Department from *releasing* that information. *Id.* at 7-8. Therefore, the court concluded, the event "trigger[ing]" the statute was not the PRA request but, instead, the Department's "obligation under the PRA to actually release the information." *Id.* at 8. For this conclusion, the *PSARA* court relied on *In re Personal Restraint of Flint*, 174 Wn.2d 539, 547, 277 P.3d 657 (2012), a case addressing the "'triggering event'" for an amendment to a statute governing community custody violations. *PSARA*, No. 50430-8-II, slip op. at 8.

We granted SEIU 925's petition for review. *SEIU 925 v. Dep't of Early Learning*, 192 Wn.2d 1022 (2019).

-6-

ANALYSIS

All the issues presented in this case are questions of statutory interpretation. These are questions of law reviewed de novo. *Williams v. Tilaye*, 174 Wn.2d 57, 61, 272 P.3d 235 (2012).

SEIU 925 argues that the Court of Appeals should have applied the analysis used in *PSARA*, according to which RCW 43.17.410(1) (barring release) is "triggered" by an agency's release of records, not by a public records request. Under that analysis, there is no question of retroactivity because RCW 43.17.010(1) applies *prospectively* to govern agency responses to PRA requests pending upon its enactment. The Foundation counters with two arguments. First, it contends there are good policy reasons to hold that, in any PRA dispute, the event "triggering" the application of governing law is always the request records. Consistent with the Court of Appeals decision below, this rule would mean that PRA disputes are always governed by the law in effect at the time of the request, unless a subsequent enactment is explicitly retroactive. The Foundation reasons that this rule will prevent agencies from dragging their feet after receiving a request, in the hope that new legislation will nullify their obligation to respond. It also contends that this time-of-request rule is consistent with the PRA's broad disclosure mandate, at least

in this case. Second, the Foundation argues that a PRA request creates a vested right, which the legislature may not retroactively infringe in any event.

If a PRA request creates a "vested right" to access responsive records, there is no need to determine what event triggers RCW 43.17.410(1) or to consider any other question of statutory interpretation in this case. Because no law may retroactively infringe a "vested right," *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 413-15, 869 P.2d 28 (1994), affirming the Court of Appeals on that point would be dispositive. Therefore, we begin our analysis by explaining why a PRA request does not create a vested right. We then explain why the provisions of I-1501 relevant in this case are triggered by the agency's release of records, making them applicable when the trial court ruled on the preliminary injunction.

I.    A PRA Request Does Not Create a Vested Right To Examine Responsive Records

The vested right doctrine is a constitutional protection for property rights. *Vashon Island Comm. for Self-Gov't v. Boundary Review Bd.*, 127 Wn.2d 759, 768, 903 P.2d 953 (1995). It protects private citizens against legislative takings and impairment of contracts. *See Gillis v. King County*, 42 Wn.2d 373, 376, 255 P.2d 546 (1953). Accordingly, even if a new law is made expressly retroactive, it will

not be given retroactive effect if this infringes a true vested right. *Caritas*, 123 Wn.2d at 413-15. A retroactive amendment does not infringe a vested right merely because it disappoints expectations. *See Omega Nat'l Ins. Co. v. Marquardt*, 115 Wn.2d 416, 433, 799 P.2d 235 (1990) ("A party has no vested right in the continuation of existing statutory law."). On the contrary, "[a] vested right involves 'more than . . . a mere expectation'" and requires an actual "'title, legal or equitable, to the present or future enjoyment of property'." *In re F.D. Processing, Inc.*, 119 Wn.2d 452, 463, 832 P.2d 1303 (1992) (second alteration in original) (quoting *Miebach v. Colasurdo*, 102 Wn.2d 170, 181, 685 P.2d 1074 (1984)).

Consistent with this standard, this court has found a vested right to a method of Medicaid reimbursement for land already purchased, *Caritas*, 123 Wn.2d at 413-15, and to a perfected security interest in a debtor's inventory and accounts, *F.D. Processing*, 119 Wn.2d at 463. In contrast, we have not found a vested right to the continued existence of a zoning scheme under which a developer began, but did not complete, an application for a building permit, *Abbey Rd. Grp., LLC v. City of Bonney Lake*, 167 Wn.2d 242, 247-48, 254-61, 218 P.3d 180 (2009) (lead opinion); *id.* at 261-63 (Madsen, J., concurring), or to the ability to send one's child to a particular public school, *Citizens Against Mandatory Bussing v. Palmason*, 80 Wn.2d 445, 452, 495 P.2d 657 (1972).

The Court of Appeals opinion in this case provides no analysis explaining why a PRA request creates a vested right. Nor does *Dragonslayer*, the sole authority that court cited for this point. Each opinion simply states in conclusory fashion that an amendment creating a new exemption from PRA requirements cannot be "remedial" (and therefore presumptively retroactive) because it affects a vested right (to inspect or copy records). *SEIU 925*, No. 49726-3-II, slip op. at 12; *Dragonslayer*, 139 Wn. App. at 449. This is incorrect. It is true that an amendment will not be deemed "remedial" if it affects a *substantive* or a vested right, *F.D. Processing*, 119 Wn.2d at 462-63, and there is no dispute in this case that new exemptions to the PRA affect the substantive right to access government records. But a PRA request is nothing like the activities this court has held to create constitutionally vested rights. To the extent *Dragonslayer* and the Court of Appeals opinion in this case hold otherwise, they are overruled.

II.    RCW 43.17.410(1) Is Triggered by the Agency's Release of Records Rather Than the Original Request; It Therefore Applied When the Trial Court Ruled on the Preliminary Injunction

As noted, the Court of Appeals in this case purported to recognize a general rule, applicable to any "statute affecting the disclosure of records." *SEIU 925*, No. 49726-3-II, slip op. at 13. Under this rule—which the Court of Appeals derived solely from footnoted dicta in a distinguishable case—the law governing a pending

public records request is always "the law in existence at the time the request was made." *Id.* at 13 (citing *John Doe A*, 185 Wn.2d at 375 n.2). This was error.

The "triggering event" analysis is fundamentally an inquiry into legislative intent. *See In re Estate of Haviland*, 177 Wn.2d 68, 75-76, 301 P.3d 31 (2013). The *John Doe A* dicta aside, nothing in the PRA itself indicates any intent to adopt a blanket time-of-request rule.[1] Nor can the courts impose one. Because a PRA request does not create a vested right, it is not entitled to any special judicial protection against changes in the law—the legislative branch has the right to frustrate a pending PRA request. That being the case, a court cannot preemptively announce a rule that PRA requests are always governed by the law in effect when they were filed. Instead, we must proceed on a case-by-case basis to determine the intent underlying any PRA-related amendment or other new law.

To determine what event triggers the application of new law, courts look to the subject matter regulated by the statute in question and to the statute's plain language, with the goal of effectuating the legislature's (or, as here, voters') intent. *Id.*; *Utter ex rel. State v. Bldg. Indus. Ass'n of Wash.*, 182 Wn.2d 398, 410 n.3, 341

---

[1] While the Foundation is correct that courts must construe the PRA in favor of broad disclosure, RCW 42.56.030, that rule does not support the imposition of a time-of-request rule. Because subsequent events may well make records *more* accessible than they were at the time of a request, such a rule is just as likely to limit disclosures as to broaden them.

P.3d 953 (2015) (courts interpret voter initiatives according to general rules of statutory construction (citing *City of Spokane v. Taxpayers of City of Spokane*, 111 Wn.2d 91, 97, 758 P.2d 480 (1988))). Because it tends to implicate retroactivity concerns, any triggering event analysis must address these indicia of intent in light of relevant constitutional interests (e.g., ex post facto clause protections and vested rights), *Flint*, 174 Wn.2d at 547-48, and "[e]lementary considerations of fairness," *In re Estate of Burns*, 131 Wn.2d 104, 110, 928 P.2d 1094 (1997) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)); *cf. State v. Jefferson*, 192 Wn.2d 225, 246-49, 429 P.3d 467 (2018) (GR 37, governing *Batson*[2] challenges, is triggered by voir dire rather than direct appeal because the new rule implicates substantial constitutional rights and thus attaches new legal consequences to triggering event). In this case, that analysis supports SEIU 925's position and the *PSARA* court's conclusion: the event triggering I-1501's relevant provisions is not the request for records but the agency's "obligation under the PRA to actually release [them]." *PSARA*, No. 50430-8-II, slip op. at 8.

The provisions relevant here appear in part three of the initiative, entitled "Prohibiting the Release of Certain Public Records That Could Be Used To

---

[2] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Victimize Seniors and Vulnerable Individuals." CP at 304. By its plain terms, this part of the initiative governs release, not requests.

The statement of intent in section 7 of part three of I-1501 also refers explicitly to the "release of public records":

> It is the intent of part three of this act to protect seniors and vulnerable individuals from identity theft and other financial crimes by preventing the release of public records that could be used to victimize them. Sensitive personal information about in-home caregivers for vulnerable populations is protected because its release could facilitate identity crimes against seniors, vulnerable individuals, and the other vulnerable populations that these caregivers serve.

*Id.*

Two other provisions in I-1501's part three also support SEIU 925's position. The first is section 10, the provision relied on by the *PSARA* court, and now codified at RCW 43.17.410(1). It provides:

> To protect vulnerable individuals and their children from identity crimes and other forms of victimization, neither the state nor any of its agencies shall release sensitive personal information of vulnerable individuals or sensitive personal information of in-home caregivers for vulnerable populations.

RCW 43.17.410(1); *see also* CP at 305. As the *PSARA* court noted, this provision amended chapter 43.17 RCW, which is titled "Administrative departments and agencies—General provisions" and is not limited to the context of PRA requests.

Finally, section 11 of the initiative, now codified at RCW 42.56.645, also supports SEIU 925's position. It contains a list of exceptions to the initiative's

general rule barring release. RCW 42.56.645(1) ("Nothing in [this act] shall prevent the release of public information in the following circumstances . . . ."). Two of these exceptions accommodate the public's interest in obtaining information: there is one for information concerning "individuals who have been accused of or disciplined for abuse, neglect, exploitation, abandonment, or other acts involving the victimization of individuals or other professional misconduct," and another for certain releases "to a bona fide news organization." RCW 42.56.645(1)(b), (h). There is no exception for pending PRA requests.

To be sure, if there were any ambiguity here, the PRA's broad disclosure mandate would compel us to affirm the Court of Appeals. *See* RCW 42.56.030 ("This chapter shall be liberally construed and its exemptions narrowly construed . . . [and] [i]n the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern."); *Fisher Broad.—Seattle TV LLC v. City of Seattle*, 180 Wn.2d 515, 525, 326 P.3d 688 (2014) (all exceptions to the PRA's disclosure requirements, "including 'other statute' exceptions, are construed narrowly" (citing *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 138-39, 580 P.2d 246 (1978))). But the relevant statutes are clear. I-1501's amendment to chapter 43.17 RCW plainly applies to the release of records. Since that application raises

no ex post facto concerns[3] and infringes no vested rights, we hold, consistent with the Court of Appeals' analysis in *PSARA*, that RCW 43.17.410(1) is triggered by the release of records responsive to a pending request.

## CONCLUSION

RCW 43.17.410(1) was in effect when the trial court issued the preliminary injunction on December 9, 2016, and therefore applied prospectively on that day to bar release of the records responsive to the Foundation's pending request. Accordingly, we reverse the Court of Appeals and remand to the trial court for consideration of the remaining prerequisites to injunctive relief.

---

[3] A law violates ex post facto clause protections when it "imposes punishment on an act which was not punishable at the time the act was committed, or when it increases the quantum of punishment for the crime after the crime was committed." *State v. Schultz*, 138 Wn.2d 638, 643, 980 P.2d 1265 (1999). None of the provisions in I-1501's section 3 impose any punishment at all.

Stephens, J.

WE CONCUR:

Wiggins, J.

González, J.

Gerald McCloud, J.

Owens, J.

No. 96578-1

MADSEN, J. (concurring)—I agree with the majority that Initiative 1501 (I-1501) prevents the release of the names and addresses of individuals providing childcare under Washington's Working Connections Child Care program that were requested prior to I-1501's enactment. I also agree that the Public Records Act (PRA), ch. 42.56 RCW, does not create a vested right for requesters to examine records. I write separately because I would hold I-1501 applies retroactively to pending records requests and emphasize that the question facing the court today is a narrow one. We are asked to decide, in the context of a trial court's ruling on injunctive relief, whether a court should apply new law to a pending PRA request. Instead of answering this narrow question, the majority broadly states that new law on PRA exemptions applies when an agency plans to release requested records, which conflicts with this court's recent PRA decision in *Gipson v. Snohomish County*, No. 96164-6 (Wash. Oct. 10, 2019), http://www.courts.wa.gov/opinions/pdf/961646.pdf.

## ANALYSIS

Generally, the law applicable to a case is that which is in effect when a trial court rules. *State v. Brewster*, 152 Wn. App. 856, 859, 218 P.3d 249 (2009). Here, we are

asked to decide if this rule controls when a PRA request is made, the applicable law on exemptions changes, and a party seeks injunctive relief applying the changed law. This is a narrow question, and our answer to it must be considered in light of the unique procedural posture in which it arises.

Turning first to retroactivity, the language of I-1501 fairly conveys the intent of the voters to apply the initiative to pending PRA requests. Intent for retroactive application may be "fairly convey[ed]" from the language of an initiative. *State v. Zornes*, 78 Wn.2d 9, 13, 475 P.2d 109 (1970) (plurality opinion), *overruled on other grounds by United State v. Batchelder*, 442 U.S. 114, 99 S. Ct. 2198, 60 L. Ed. 2d 755 (1979). The allegedly retroactive law at issue in *Zornes* cited to language stating that the provisions "'shall not ever be applicable to any form of cannabis'" and noted that "not ever" would be unnecessary if the legislature intended the act to only operate prospectively. *Id.* (quoting LAWS OF 1969, ch. 256, § 7(13)); *see also State v. Rose*, 191 Wn. App. 858, 865, 365 P.3d 756 (2015) (examining *Zornes*). Here, I-1501 does not contain similarly unequivocal words. But such unequivocal statements are not necessarily required to evidence retroactive intent.

In *State v. Grant*, a defendant appealed her conviction for intoxication on a public highway in violation of RCW 9.68.040, which had been repealed in 1972. 89 Wn.2d 678, 681, 575 P.2d 210 (1978). When this court reviewed the appeal, a new act was in effect, which stated that intoxicated persons may not be subjected to criminal prosecution solely because of their consumption of alcohol but, rather, should be afforded treatment.

2

*Id.* at 682 (citing former RCW 70.76A.010 (LAWS OF 1972, Ex. Sess., ch. 122, § 31)).

Relying on *Zornes*, the *Grant* court found legislative intent in the statement that "no person shall go to trial on such a charge after the effective date of the act," indicating its retroactive application. *Id.* at 684. In *Rose*, the Court of Appeals examined whether Initiative 502 decriminalizing marijuana applied to pending prosecutions. 191 Wn. App. at 862-63. I-502 stated that the "'people intend to stop treating adult marijuana use as a crime and try a new approach.'" *Id.* at 868. Treating marijuana as a crime occurs when a suspect is arrested and charged, as well as when a suspect is taken to trial and when a court imposes a punishment. *Id.* at 869. The court held that a voter would read intent to stop treating marijuana as a crime as stopping prosecutions on the effective date of the initiative. *Id.*

Similar to *Zornes*, *Grant*, and *Rose*, the statement of intent in this case applies to pending records requests. I-1501 states that it intends to "*protect* seniors and vulnerable individuals from identity theft and other financial crimes by *preventing* the release of public records that could be used to victimize them." Clerk's Papers (CP) at 304 (section 7) (emphasis added). The intent statement of part III goes on to explain that the release of personal information about in-home caregivers "is protected because its release could facilitate identity crimes against seniors, vulnerable individuals, and the other vulnerable populations that these caregivers serve." *Id.* The repeated reference to "release" of personal information is not strictly prospective; pending requests would also release the information protected by the initiative. And this protection would be meager indeed if it

3

applied solely to records released after I-1501's effective date—it would leave out the personal information in pending PRA requests and leave seniors and their caregivers vulnerable to financial crimes. I-1501 states that the law is to be liberally construed to promote the policy of protecting in-home caregivers for vulnerable populations. *Id.* at 306 (section 12).

The plain language of the initiative fairly conveys the voters' intent to stop the release of sensitive information of vulnerable populations and thus stop fraudulent actors who "continue to prey on them." State of Washington Voters' Pamphlet, General Election 35 (Nov. 8, 2016). The terms "release" and "protection" indicate that a voter would assume I-1501 applies to pending PRA requests.

Accordingly, I would hold that I-1501 applies retroactively and the trial court should have applied the law in effect at the time it issued its ruling. A court's denial of injunctive relief and order to release records triggers I-1501's retroactive application.

The majority analyzes I-1501's *prospective* application and concludes that the triggering event for I-1501's relevant provisions is an agency's obligation to release requested records. Majority at 12. I disagree. In light of the plain language of the initiative and the procedural context of this case, it is not the *agency's* release of records but the *trial court's order* to release records that triggers I-1501's application. Tethering I-1501 to an agency's release would directly conflict with this court's recent decision in *Gipson.* In *Gipson,* we concluded that an agency is not required to continuously monitor for changes in exemptions it asserted when a PRA request is first received, regardless of

4

the number of installments of records necessary to satisfy the request. *Gipson*, slip op. majority at 9, 13 (Madsen, J.). Under the majority's approach in the present case, an agency responding to a single voluminous request would be required to re-review a claimed exemption for every installment of records it releases—expressly contrary to *Gipson*. The majority's holding is unnecessarily broad and undercuts decided PRA case law without acknowledgment or explanation. This conflict could be easily avoided by tying I-1501's triggering event to the trial court's decision regarding releasing requested records rather than to an agency's obligation to release requested records. While I cannot join the majority's holding in this respect, I nevertheless agree that I-1501 applied and barred release of the requested records.

With these considerations in mind, I respectfully concur.

No. 96578-1
Madsen, J., concurring

Madsen, J.

Fairhurst, CJ.

Yu, J.